J-A10002-26                    2026 PA Super 178

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| ELIJAH SHARPE | : | No. 3061 EDA 2024 |

Appeal from the Judgment of Sentence Entered June 7, 2024
In the Court of Common Pleas of Philadelphia County
Criminal Division at No:  CP-51-CR-0008684-2023

BEFORE:   STABILE, J., LANE, J., and STEVENS, P.J.E.[*]

OPINION BY STABILE, J.:                    **FILED AUGUST 6, 2026**

This Commonwealth appeal concerns the reasonableness of a downward departure sentence far below the mitigated range of the sentencing guidelines.  In 2024, Elijah Sharpe (Appellee) pleaded guilty to numerous drug related offenses which he had committed while already serving probation in three other similar cases.  The standard range under the statutory sentencing guidelines was a prison term of eight to 15 years, with a minimum mitigated range of seven years.  However, the Court of Common Pleas of Philadelphia County (trial court) imposed an aggregate prison term of only 11.5 to 23 months, with immediate parole to house arrest, followed by 10 years of probation.  The Commonwealth contends that this extreme downward departure was unreasonable because the record as a whole does not reflect a proper consideration of the facts of the crime and character of the offender.

_____

[*] Former Justice specially assigned to the Superior Court.

Finding merit in the Commonwealth's claim, we vacate the judgment of sentence and remand for resentencing.

The underlying case facts are not in dispute. Appellee, Elijah Sharpe, was a prominent player in a drug trafficking organization that operated in the Philadelphia neighborhood of Kensington, which is well-known to be one of the largest and most lethal markets for fentanyl in Philadelphia. During the summer and early fall of 2023, the Pennsylvania State Police and Office of the Attorney General were authorized to wiretap telephone calls between Appellee and other members of a suspected conspiracy to distribute narcotics in Kensington.

Appellee can be heard in the intercepted calls directing the distribution and sale of fentanyl and cocaine. That is, these calls demonstrated that Appellee was not a lower-level member of the enterprise. He was instead in control of his own territory within the city block bordered by Shelbourne Street and Hilton Street. Video surveillance of Appellee during this period also showed him both picking up drugs from distribution centers and then supplying "stash houses" in his territory with that contraband. Two of Appellee's most popular products were baggies of fentanyl "stamped" with the brand names, "Death Row" and "Theraflu."[1]

_____

[1] The fentanyl packaged in the baggies was mixed with xylazine, an animal tranquilizer associated with an increased risk of fatal overdose when ingested by humans. *See* https://www.cdc.gov/overdose-prevention/about/what-you-should-know-about-xylazine.html (last visited June 8, 2026).

On October 4, 2023, police simultaneously executed search warrants at eight locations in Kensington where Appellee and his associates had been operating. At the three locations directly linked to Appellee, police seized 266 grams of fentanyl/xylazine, 50 grams of methamphetamines, and 236 grams of cocaine and crack cocaine. As evidenced by their volume and packaging (enough for thousands of individual doses), these substances were intended for street sale. **See generally** N.T. Plea Hearing, 3/22/2024, at 15-17 (recitation of factual predicate of guilty plea). Police also recovered at the residences a small arsenal consisting of an AK-47 Rifle, a 12-gauge shotgun, pistols, ammunition, and other firearm accessories. **See** Trial Court 1925(a) Opinion, 4/3/2025, at 6-7 (summarizing record facts).

The day after the searches, Appellee and seven co-defendants were criminally charged. Appellee ultimately entered a non-negotiated guilty plea to one count each of possession with intent to deliver (PWID) (35 Pa.C.S.A. § 780-113(a)(30)), criminal conspiracy (18 Pa.C.S.A. § 903), and corrupt organizations (18 Pa.C.S.A. § 911). The trial court ordered a presentence investigation report (PSI) and a mental health evaluation. Both parties filed presentence memoranda.

At Appellee's sentencing hearing on June 7, 2024, the trial court and the parties agreed that the offense gravity score was 14 for the PWID conviction, and 8 for the corrupt organizations conviction. The parties agreed further that Appellee's prior record score was 2. Based on those scores, the parties stipulated that the applicable sentencing guidelines for the PWID conviction

were eight to 15 years in the standard range, plus one year in the aggravated range, or minus one year in the mitigated range. As to the corrupt organizations count, the guidelines range was 15 to 20 months, plus or minus nine months. *See* N.T. Sentencing Hearing 6/7/2024, at 5-7.[2]

The Commonwealth recommended a standard range prison sentence of nine to 20 years. The severity of this recommendation was intended to be commensurate with Appellee's status as a high-ranking member in his criminal organization, as well as Appellee's apparent disregard for human life. The Commonwealth emphasized that Appellee had personally directed the sale and distribution of narcotics, namely fentanyl, despite his full knowledge of the dangers it posed. In fact, Appellee had himself ceased abusing Percocet pills because he feared they could contain fentanyl. *See id*., at 8-9.

The specifics of Appellee's role were gleaned in part from intercepted phone calls in which he could be heard instructing his subordinates on what to sell, where to sell it, and how to deal with competitors. As shown in a conversation with a co-defendant, Frank Myers, Appellee was especially keen to hand out "samples" of his products in areas where rival upstarts were encroaching on his territory:

> [Appellee]: Let them . . . give out samples. Let them do all that. By Friday we gonna be loaded up. We gonna hit em with samples all day that day.

---

[2] The offense gravity score for the conspiracy conviction was 14, carrying a standard guidelines range of 90 months. This count was merged with the PWID conviction for purposes of sentencing.

[Myers]: Alright, he made them . . . draw.

[Appellee]: Man f\*\*k them . . . yo.

[Myers]: I already know.

[Appellee]: That s\*\*\* is gonna start a whole war bro. I seen young bull over there gone do something. That s\*\*\* is gonna start a whole war. That's gonna shut both us down.

Commonwealth's Sentencing Memorandum, 5/15/2024, Exhibit C.

In another call with a different conspirator, Appellee was amused by the fact that the potency of his product, "Death Row," would likely kill one of his customers:

[Appellee] - Aright I'm about to send my girl. I'm about to send m[y] girl up there . . . to give you them samples cause I'm tagging up right now.

[Unidentified] - Aright [okay].

[Appellee] **- That's what I'm sayin that shit. That shits some bang though bro so be careful with that shit**. Ima give you um.

[Unidentified] - I got you. Aright you gonna give me two different jawns?

[Appellee] - Yea ima give you two. Ima give you two different stamps. Ima give you uh its like uh two, three bags. Ima give you like three bags of the Death row and three bags of Theraflu and you tell me which one you want. Which one better.

[Unidentified] - Aright [okay].

[Appellee] **- I know the, I know the Death row gonna be the bang bro its gon probably put somebody down.**

[Unidentified]- (laughs) Bro that's crazy.

[Appellee] - You gonna see for yourself ima tell everybody down the way.

*Id*., at Exhibit H (emphasis added).

Appellee's culpability was further illustrated by posts he had made on his Instagram account, "IamKensington." One photo, showing a group of his customers in the midst of drug use, contains a caption in which Appellee perversely thanks them for his livelihood. The caption reads, "I love y'all cuz without y'all ain't no me." Commonwealth's Sentencing Memorandum, 5/15/2024, Exhibit J. In another photo bearing the caption, "In The Trenches," one of Appellee's customers is standing on a sidewalk with his possessions strewn on the ground in front of him; Appellee is shown next to the customer, grinning as he uses both hands to fan stacks of currency. *See id*., at Exhibit K.

Defense counsel attempted to downplay Appellee's authority in the drug ring by stressing that he was only 23 years old; he had demonstrated high intelligence; and he was remorseful. Counsel then reviewed Appellee's employment history, including his work as a "flagger" for All State Traffic Control, and as a home health aide for a relative. In addition, Appellee had accepted responsibility by waiving a jury trial, and a preliminary hearing in this case. *See* N.T. Sentencing Hearing, 6/7/2024, at1 3-17. It was defense counsel's view that a lengthy prison sentence would only turn Appellee into a "kingpin," and that it would be more beneficial to him, and to his community at large, to impose a sentence of 23 months of house arrest, followed by probation. *See id*.

Both the Commonwealth and the defense had agreed at the outset of the sentencing hearing that Appellee's guilty pleas reflected his acceptance of responsibility for his crimes, which would be a mitigating sentencing factor. However, during his allocution, Appellee took far less of the blame for his conduct than the plea would suggest. *See* Sentencing Hearing, 6/7/2024, at 18. He began by apologizing for his "mistake," *see id*., but quickly segued to portraying himself as an innocent victim of circumstance:

> [Appellee]: They had me under surveillance for a whole year. I ain't had one direct contact, one direct sub. They sent -- they sent cops in. **I told the cops I don't sell drugs**. I -- I don't know what -- what's more than -- what more can I say if I don't sell drugs. **Like I feel like I was targeted** and now I'm being -- they try to use my Instagram. I'm from Kensington. My family from Kensington. I know -- I know everybody in -- **I just grew up down there. Don't mean I'm running nothing**.
>
> **[I] don't got the power to force somebody to sell drugs or force somebody to do this and do that. But that's what they're trying to make me seem like**. Today, they going to do that cause they don't want to be behind them walls away from my kids. So like – it don't -- it don't make no sense to me. Now, I'm holding up money now it's -- it's just from drugs. I work hard for my money. I work -- I came in every week with my paystubs. And I was going to school. **And I got time to run the streets? I was working Monday to Friday. I went to school Monday to Thursday. Then I got three kids with three different girls. I don't got time to run the streets.** How they saying they was watching me for a year. I would have been locked up. And -- and they got phone taps four to five days before my arrest. **This case wasn't really making sense. But I know -- fighting these cases take time and money but I don't got**. I got a family. I got my aunt. I got my -- my -- my nieces. My sons. My daughter. I ain't even get to see my daughter. She was born two days after I got locked up.

It's just -- it's a lot of stuff that's going on that I know I couldn't sit here and fight this. So I'm -- I'm willingly and respectfully saying on my part what I did wrong but to -- try and accuse me and saying I'm -- I'm the one running everybody and I'm telling him to sell drugs and I'm telling him to do that. **That -- that's not me. I can't force nobody to -- to do anything. If -- if anything I'd just say I was around the wrong crowd. That's it. I -- I -- selling the drug the whole time. Here I didn't. I was working every day.**

I was going to school every day. I got my -- got my permit. You got -- you got proof of this. You got proof of this. Every month I was coming in here checking it every month. Even the day you didn't come to my court the court room. I bring my paystubs with my -- with my note from school. Now they trying to send me to prison for nine -- nine to 20 years away from my son. Off -- off of phone taps. And -- and I ain't get -- when they arrested me. They ran in my aunt crib.

They ran -- I mean they ran in my aunt house. They ran in my house. Nothing. Nothing was -- was in those houses. And those is direct -- those is -- she's like my mom so it's like they run in her house looking for stuff. They can run in my house they didn't find nothing. And they took stuff -- they had -- had no business taking. **It's just the whole case was crazy. And it doesn't make no sense.** A lot -- a lot of illegal stuff happened in this case.

**\* \* \* \***

[Appellee]: That's all. When I came -- when I came home. You let me home my last time. I did everything by the book. I never had a hot urine. I never had nothing with my PO's. And I -- if I had to reschedule, I rescheduled. Anything that you want to answer to I did. Brother Jay. You know how I did with Brother Jay. He came here every court room. Talks to me every day how good I was doing in his program. That you let me out on house arrest early. I did -- I did only -- you let -- you sentenced me like I (inaudible) after only six months cause of how good I was doing. I got the (inaudible) position. There's a lot of things they ain't going to tell you. They just going to tell you that I was running this or running that and I they want me to go up state for nine to ten years. But -- that's --

[Trial Court]: I'm just looking through the paystubs that I received from the times that you did come in. And I did see some. And I also saw that you -- got your [commercial driver's license] as well.

[Appellee]: I got my permit -- I'm two – when they arrested me I was two hours away from getting my -- my real license.

[Trial Court]: Right.

[Appellee]: I got to take the state exam. And -- like I said I had a lot of good things going. I ain't -- I'm not just somebody that I don't think I should be [incarcerated] for . . . nine to 20 years and just throw away the key. I'm home and I'm almost 40. That's all. Like I said, I'm sorry for being in your courtroom again. It won't happen again. I just -- this particular case, **I just feel like I was just around the wrong – the wrong time and people and thing.**

*Id*., at 18-22 (emphasis added).

The trial court gave little credence to Appellee's assertion of innocence, finding that he was "entrenched in this corrupt organization." *Id*., at 26. Yet, the trial court found that there was enough evidence to justify a downward departure from the mitigated range of the sentencing guidelines. The trial court noted that Appellee had nearly obtained a commercial driver's license, and that he had likely suffered from post-traumatic stress disorder while being held in custody for seven months in the present case.

Moreover, the trial court observed that Appellee had a difficult upbringing, as his mother went to prison shortly after his birth and his father then abandoned him, leaving Appellee to be raised by his grandparents until the age of 10. Between the ages of 12 and 18, Appellee was placed in a series of juvenile shelters, where he was physically abused. At some point during

that period, Appellee sustained five gunshot wounds, and apparently made a full recovery. *See* Trial Court 1925(a) Opinion, 4/3/2025, at 21.

The trial court stressed further that Appellee is the father of three young children, who would benefit from having Appellee obtain gainful employment. The trial court questioned whether Appellee was genuinely remorseful, but nevertheless stated that Appellee's "acceptance of responsibility," his age, and the "nonviolent" nature of his offenses warranted a sentence below the mitigated range of the sentencing guidelines. *See* Sentencing Hearing, 6/7/2024, at 27-28. Appellee was then in effect sentenced to house arrest, followed by 10 years of probation. *See id*.

At the time Appellee was charged and arrested in the present case, he was serving probation in three cases (docketed at case numbers CP-51-CR-8021-2018, CP-51-CR-6852-2019, CP-51-CR-2992-2021), all of which involved the possession and intended sale of drugs. Appellee was found to be in direct violation of his probation in those cases. The probationary sentence imposed in the present case was made concurrent to the sentences imposed in those earlier cases. *See id*., at 32.[3]

The trial court explained that a long probationary period was justified because, as to Appellee's prospects for rehabilitation, the court's "confidence level" was "not as high" as it was at the time of his prior sentencing. *Id*., at

---

[3] Appellee was also twice adjudicated delinquent. As an adult, Appellee had been arrested on 11 occasions prior to being arrested in the present case, accumulating convictions in four of those prior matters.

30. The trial court was also "not sure" whether Appellee was "done selling drugs yet," or whether he was genuinely remorseful and "ready to seriously move in a different direction." *Id*., at 27-29.

The Commonwealth filed a timely motion for reconsideration on the ground that the sentence was excessively lenient, constituting an unreasonable downward departure from the statutory guidelines range. The motion was denied by operation of law, and the Commonwealth timely appealed. The Commonwealth now asserts a single claim in its brief – whether the trial court "abuse[d] its discretion in imposing an unreasonably lenient sentence, which was a departure below the sentencing guidelines.[.]" Commonwealth's Brief, at 3.

The sole issue raised in the present case concerns a challenge to the discretionary aspects of Appellee's sentence. "Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of that discretion." *Commonwealth v. Johnson*, 666 A.2d 690, 693 (Pa. Super. 1995). "[C]hallenges to the discretionary aspects of sentencing do not entitle an appellant to review as of right." *Commonwealth v. Derry*, 150 A.3d 987, 991 (Pa. Super. 2016) (citations omitted).

Accordingly, as the Commonwealth's claim relates to a discretionary aspect of a sentence, we must first determine:

> (1) whether the appeal is timely; (2) whether Appellant preserved his issues; (3) whether Appellant's brief includes a [Pa.R.A.P. 2119(f)] concise statement of the reasons relied upon for

allowance of appeal with respect to the discretionary aspects of sentence; and (4) whether the concise statement raises a substantial question that the sentence is inappropriate under the sentencing code.

*Commonwealth v. Corley*, 31 A.3d 293, 296 (Pa. Super. 2011) (citations omitted).

"To preserve an attack on the discretionary aspects of sentence, an appellant must raise his issues at sentencing or in a post-sentence motion. Issues not presented to the sentencing court are waived and cannot be raised for the first time on appeal." *Commonwealth v. Malovich*, 903 A.2d 1247, 1251 (Pa. Super. 2006) (citations omitted); *see also* Pa.R.A.P. 302(a) (stating that "[i]ssues not raised in the trial court are waived and cannot be raised for the first time on appeal").

"The determination of what constitutes a substantial question must be evaluated on a case-by-case basis." *Commonwealth v. Battles*, 169 A.3d 1086, 1090 (Pa. Super. 2017) (citation omitted). "A substantial question exists only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process." *Commonwealth v. Grays*, 167 A.3d 793, 816 (Pa. Super. 2017) (citation omitted).

Here, the Commonwealth successfully has invoked this Court's discretionary jurisdiction. The claim now being raised was preserved in a post-sentence motion and a Rule 1925(b) statement; the Commonwealth timely filed a timely notice of appeal; and a Rule 2119(f) statement was included in

its brief. Further, the Commonwealth's claim raises a substantial question. *See Commonwealth v. Sims*, 728 A.2d 357, 359 (Pa. 1999) (substantial question presented in claim that trial court unreasonably sentenced defendant below the mitigated guideline range); *Commonwealth v. Childs*, 664 A.2d 995, 996 (Pa. Super 1995) (same).

We now turn to the merits of the Commonwealth's contention that the trial court abused its discretion by sentencing Appellee to a term well below the mitigated range of the sentencing guidelines.

"When imposing a sentence, the sentencing court must consider the factors set out in 42 Pa.C.S.[A.] § 9721(b), [including] the protection of the public, [the] gravity of offense in relation to impact on [the] victim and community, and [the] rehabilitative needs of the defendant." *Commonwealth v. Fullin*, 892 A.2d 843, 847 (Pa. Super. 2006) (citation omitted and formatting altered). A sentence may be deemed unreasonable on appeal, notwithstanding the existence of mitigating evidence, if the trial court has disregarded those general standards. *See generally Commonwealth v. Walls*, 946 A.2d 957, 964 (Pa. 2007) ("[A] sentence may . . . be unreasonable if the appellate court finds that the sentence was imposed without express or implicit consideration by the sentencing court of the general standards applicable to sentencing found in Section 9721, *i.e.*, the protection of the public; the gravity of the offense in relation to the impact on the victim and the community; and the rehabilitative needs of the defendant.").

"A sentencing court need not undertake a lengthy discourse for its reasons for imposing a sentence or specifically reference the statute in question, but the record as a whole must reflect the sentencing court's consideration of the facts of the crime and character of the offender." *Commonwealth v. Crump*, 995 A.2d 1280, 1283 (Pa. Super. 2010) (citing *Commonwealth v. Malovich*, 903 A.2d 1247, 1253 (Pa. Super. 2006)). The balancing of the sentencing factors is the sole province of the sentencing court, which has the opportunity to observe the defendant and all witnesses firsthand. *See Commonwealth v. Kurtz*, 294 A.3d 509, 536 (Pa. Super. 2023), *affirmed*, 348 A.3d 133 (Pa. 2025).

To justify a downward departure from the guideline sentence recommendation, the trial court may consider numerous factors, including those in the following non-exhaustive list enumerated in the statutory guidelines:

(i) Nature and circumstances of the offense:

(A) Neither caused nor threatened serious harm.

(B) Conduct substantially influenced by another person.

(C) Acted under strong provocation.

(D) Substantial grounds to justify conduct.

(E) Role in offense.

(F) Purity of controlled substance.

(G) Abuse of position of trust.

(H) Vulnerability of victim.

(I) Temporal pattern.

(J) Offense pattern.

(K) Multiple offenses in a criminal incident.

(ii) History and character of the person:

(A) No history of criminal conduct.

(B) Substantial period of law-abiding behavior.

(C) Circumstances unlikely to recur.

(D) Likely to respond affirmatively to probation.

(E) Imprisonment would entail excessive hardship.

(F) Accepts responsibility.

(G) Provides substantial assistance.

(H) Compensated victim or community.

(I) Character and attitude.

(J) Treatment for substance abuse, behavioral health issues, or developmental disorders or disability.

204 Pa. Code § 303a.6(f)(1).

On review, this Court cannot reweigh sentencing factors and impose judgment in place of a sentencing court where a lower court was fully aware of all mitigating factors. *See Commonwealth v. Macias,* 968 A. 2d 773, 778 (Pa. Super. 2009). However, this Court must consider the reasonableness of a sentence by evaluating:

(1) The nature and circumstances of the offense and the history and characteristics of the defendant.

(2) The opportunity of the sentencing court to observe the defendant, including any presentence investigation.

(3) The findings upon which the sentence was based.

(4) The guidelines promulgated by the commission.

42 Pa.C.S.A. § 9781(d). A sentence may therefore be vacated, and the case remanded for resentencing, when "[t]he sentencing court sentenced outside the guidelines and the sentence is unreasonable." 42 Pa.C.S.A. § 9781(c). "[T]he General Assembly intended the concept of unreasonableness to be inherently a circumstance-dependent concept that is flexible in understanding and lacking precise definition." *Walls*, 926 A.2d at 568.

Applying these statutory mandates, we are compelled to find that Appellee's downward departure sentence is unreasonable. The findings upon which the sentence was based are not supported by the record, and the trial court has not given sufficient consideration of the general sentencing standards set forth in Section 9721.

Appellee's offense gravity score was 14, a level commensurate with serious crimes such as rape and third-degree murder. *See generally* 204 Pa.Code § 303.15. The standard guidelines range for Appellee was a prison term of eight to 15 years, with mitigated and aggravated ranges of seven and 16 years, respectively. The trial court instead sentenced Appellee to a term of house arrest (11.5 to 23 months), which was a dramatic departure from even the mitigated range of seven years.

The trial court reasoned that its departure was justified based on "the nature of the offense, Appellee's role in the offense; his acceptance of responsibility; age and behavioral health issues; Appellee's history and character and likelihood to respond affirmatively to probation; and whether imprisonment would entail excessive hardship." Trial Court 1925(a) Opinion, 4/3/2025, at 17.

As to the nature of the offenses, the trial court indicated that "Appellee's [crimes] were all nonviolent and economically based, as the crimes were drug related and did not involve the use of force or injury to another person." *Id*. The trial court also determined that Appellee was likely influenced by his older co-conspirators, and that he was not directly linked to five of the eight residences searched by police, suggesting that Appellee was more of a mid-level conspirator, and not the highest-ranking member of the drug distribution network. *Id*., at 17-19.

As to Appellee's age, the trial court cited recent changes to the federal sentencing guidelines, which were amended to reflect the relatively diminished culpability for defendants under the age of 25, prior to the stage of complete brain development. *See id*., at 19-21. The trial court found that Appellee's prior traumatic experiences, remorse, and prospects for rehabilitation all justified departure below the mitigated range of the sentencing guidelines. *See id*., at 22-25.

The record does not support the trial court's findings. To begin, it is a gross misstatement to label Appellee's offenses as merely "nonviolent and

economic" in nature. Appellee aggressively distributed fentanyl on a mass scale, promoting a business which preyed on those afflicted by addiction. Not long before his arrest, Appellee even had planned to expand his territory by bombarding his neighborhood with "samples" of his product, aptly called "Death Row."

The trial court is correct in stating that the crime of PWID (fentanyl) is not an offense in which the perpetrator uses his own brute strength to harm another person. Focusing only on the lack of direct force, however, obscures the obvious fact that perpetrators of the offense exploit drug users' vulnerability by supplying them with the means of harming or killing themselves. Appellee's actions no doubt led to the physical harm of *countless* individuals in this manner, and he publicly took pride in it.

In Appellee's recorded conversations about the enterprise, he himself referred to the likelihood that his product would kill his customers, as well as cause a "war" with local competitors. These comments cannot be dismissed as hyperbole, not when overdose deaths in Philadelphia have risen dramatically in recent years, and enough weapons were kept in Appellee's stash houses to wage a street war at a moment's notice.

Framing Appellee's crimes as merely "nonviolent and economic" understates the threat of Appellee's conduct to the community, conduct that frequently leads to deaths. While Appellee's offenses, in a traditional sense, may not be akin to, say, pulling the trigger of a gun, his peddling of drugs,

with full knowledge of their lethality, inflicts a degree of violence upon the community as severe as that caused by gun violence.

As well, characterizing Appellee's conduct as merely "economic" blindly ignores the ends to which drug use often fuels additional criminal activity, as addicts may have to resort to any number of illegal means to financially support their addiction. Mitigation may be proper where the nature and circumstances of the offenses are such that they neither cause nor threaten serious harm, *see* 204 Pa. Code § 303a.6(f)(1)(i)(A), but Appellee's offenses most certainly did so. In light of the nature and circumstances of those offenses, the gulf between the sentence Appellee received and the mitigated range of the guidelines cannot be justified.[4]

Moving on, we next examine the trial court's finding that Appellee's acceptance of responsibility justified the downward departure. Here again, we cannot agree that the record supports this basis for mitigation. A defendant's guilty plea, waiver of credit for time served, and waiver of a preliminary hearing, could indeed be construed in some situations as an acceptance of responsibility for criminal offenses, warranting a downward departure. However, Appellee made it clear in his allocution that he took

---

[4] It is also specious for the trial court to suggest that Appellee was less culpable than his co-defendants because Appellee did not personally own or reside in some of the residences that police searched. *See* Trial Court 1925(a) Opinion, at 17-19. Appellee pleaded guilty to one count of conspiracy. The storehouses and stash houses utilized by co-conspirators were therefore directly attributable to Appellee for present purposes.

those steps as a strategic decision to obtain for himself the best possible outcome in this case.

Repeatedly, Appellee insisted that he was innocent, that police were "targeting" him, and that he was in the wrong place at the wrong time. N.T. Sentencing, 6/7/2024, at 19. He showed some remorse for the effect his criminal case had on his family, but he did not at all acknowledge the harm he caused to fentanyl users, their families, or the community at large. To the contrary, Appellee argued that it was impossible for him to "force" anyone to abuse drugs or commit other crimes. *See id*., at 19-22.

A guilty plea and waiver of rights do not automatically entitle a defendant to a sentence far below the mitigated guidelines range. "[T]he guidelines apply to *all* sentences alike, whether imposed following a plea or trial." *Commonwealth v. Wilson*, 946 A.2d 767, 775 (Pa. Super. 2008) (emphasis in original). Mitigation, based on a supposed acceptance of responsibility, cannot be justified where, as here, Appellee instead proclaimed his innocence, going so far as to complain at the sentencing hearing that "the whole case is crazy." N.T. Sentencing, 6/7/2024, at 21; *See Commonwealth v. Daniel*, 30 A.3d 494, 499 (Pa. Super. 2011) (defendant's guilty plea did not justify "the extreme leniency accorded him given the ferocity of his [crime] and his prior criminal history"); *Commonwealth v. Kenner*, 724 A.2d 808, 812 (Pa. Super. 2001) (defendant's age (23) and lack of a prior criminal record did not justify extreme downward departure, in large part due to defendant's lack of remorse).

At best, the record demonstrates that Appellee only superficially feigned remorse for his actions and pleaded guilty to gain sentencing leniency. Appellee's allocution in fact revealed a mindset that was consistent with record evidence of his pride in his business acumen, his gratitude to customers for his financial success, and his eagerness to dispense ever-greater quantities of lethal drugs in the community to prevail over rival drug dealers. Appellee's remorse also is belied by his complaints about the perceived unfairness of his prosecution. In short, the trial court's reliance on Appellee's acceptance of responsibility is not supported by the record.

The trial court's findings with respect to rehabilitation are just as unfounded. While it is commendable that Appellee had abstained from drug use and received vocational training, he nevertheless has failed to avail himself of non-incarcerative sanctions in the past. More to the point, Appellee brazenly dispensed mass quantities of lethal substances while he was serving probation, not in one, not in two, but in *three* cases in which he had been convicted of PWID. Appellee performed well in some respects of probation in the past, but that alone hardly bodes well for his prospects on immediate release to house arrest. He utterly failed to perform the most important probationary term – refraining from committing new crimes. Not even the trial court had much confidence that Appellee was "ready" to move on from drug trafficking. ***See*** Sentencing Hearing, 6/7/2024, at 28. The record makes clear that placing Appellee on probation did absolutely nothing to curtail his

criminal activity. If anything, Appellee increased his drug activity while serving probation.

Finally, we consider the trial court's finding that incarceration would entail an excessive hardship for Appellee and his family, including his three young children. This consideration could indeed justify some measure of mitigation. Significantly, though, the trial court seemed to focus on the well-being of Appellee and his family without due regard for the great harm that Appellee has caused the residents of Kensington, many of whom no doubt have families of their own. At no point during the sentencing hearing, or its 1925(a) opinion, did the trial court recognize the dangers posed by Appellee's activities, or the how the public interest would be served by his confinement. It is also apparent that Appellee himself did not prioritize his family's welfare, as his illicit activities were in no way compatible with responsible parenting.

A sentence must be imposed for the minimum amount of confinement that is consistent with the protection of the public, the gravity of the offense and the rehabilitative needs of the defendant. *See Commonwealth v. Martin*, 351 A.2d 650, 658 (Pa. 1976). Fentanyl is lethal, and Appellee has showed no contrition for profiting from its deadly effects. He already was serving probation on multiple prior offenses at the time he was dealing fentanyl on a mass scale. Nothing in the record would inspire confidence in Appellee's ability, or desire, to refrain from doing so again. Any potential hardships that a period of incarceration might cause Appellee and his family

would pale in comparison to the collective suffering brought about by Appellee's continued promotion of fentanyl use in the Kensington area.

In sum, the trial court recounted various reasons for its dramatic downward departure from the mitigated range of the guidelines, but none of those reasons are supported by the record. The trial court imposed an entirely rehabilitative sentence that cannot be objectively justified. Appellee already had been given several chances to reform, and he used those opportunities to continue putting numerous lives at risk. The trial court failed to acknowledge the gravity of Appellee's offenses as it relates to the impact on the lives of his victims and the Kensington community. Based on the facts of this case, a sentence of immediate parole that is more than 6 years below the minimum mitigated range of sentencing for Appellee's crimes is unreasonable and an abuse of sentencing discretion.

We stress in closing that, while the guidelines are advisory, a downward departure must be supported by the record, and the general objectives of the guidelines must be honored. The guidelines establish a "sentencing system with a primary focus on retribution[.]" *Commonwealth v. Lee*, 357 A.3d 356, 394 (Pa. 2026) (quoting 204 Pa.Code § 303.11(a)). Downward departures from the recommended ranges of the guidelines are permitted only as long as they are reasonable, and derived from a full consideration of mandatory sentencing factors. *See Wilson*, 946 A.2d at 775-76 (quoting *Walls*, 926 A.2d at 963); *see also* 42 Pa.C.S.A. § 9721(b).

The purposes of the sentencing guidelines cannot be fulfilled when the court gives short shrift to key aspects of a defendant's background, the gravity of the offenses, and a lack of remorse, particularly in a case where the defendant committed the offenses while serving multiple probationary terms. Imposing purely rehabilitative measures here, *in lieu* of any retribution, is unreasonably lenient under the present facts.

"When people begin to believe that organized society is unwilling or unable to impose upon criminal offenders the punishment they 'deserve,' then there are sown the seeds of anarchy – of self-help, vigilante justice and lynch law." **Furman v. Georgia**, 408 U.S. 238, 308 (1972) (Stewart, J., concurring). "The law threatens certain pains if you do certain things, intending thereby to give you a new motive for not doing them. If you persist in doing them, it has to inflict the pains in order that its threats may continue to be believed." **Apprendi v. New Jersey**, 530 U.S. 466, 476 (2000) (citing O. Holmes, The Common Law 40 (M. Howe ed. 1963)).

In order to ensure that the express retributive aims of the Sentencing Code are applied, and that the mandatory factors are adequately considered, we hold that the trial court abused its discretion by imposing an unreasonable sentence well below the mitigated range. On remand, Appellee must be resentenced in a manner that comports with the sentencing guidelines.

Judgement of sentence vacated. Case remanded for resentencing. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>8/6/2026</u>